# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**CAPITAL TRANS INTERNATIONAL, LLC,**

      **Plaintiff,**

**v.**                                  **Case No.  8:10-cv-529-T-30TGW**

**INTERNATIONAL PETROLEUM INVESTMENT COMPANY, AABAR INVESTMENTS PJSC and TASAMEEM REAL ESTATE CO. LLC.,**

      **Defendants.**

_____/

## ORDER

THIS CAUSE comes before the Court upon Defendants' Motion to Dismiss the Amended Complaint and Memorandum of Law (Dkt. 29), Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss Amended Complaint (Dkt. 39), the Court's Order to File Supplemental Briefs (Dkt. 139), Plaintiff's Supplemental Memorandum in Opposition to Defendants' Motion to Dismiss Amended Complaint (Dkt. 142), Defendants' Supplemental Memorandum of Law in Support of Motion to Dismiss the Amended Complaint (Dkt. 151), and Motion for Leave to Intervene to Assert Charging Order Against Plaintiff Capital Trans International, LLC (Dkt. 147).  The Court, having reviewed the motions, responses, and being otherwise advised of the premises, concludes that the motion to dismiss should be granted in part and the motion to intervene should be denied as moot.

## BACKGROUND

Plaintiff Capital Trans International, LLC, ("CTI") filed an amended complaint against Defendants International Petroleum Investment Company ("IPIC"), Aabar Investments PJS ("Aabar"), and Tasameem Real Estate Company, LLC, ("Tasameem") on June 9, 2010.  In its forty-three page amended complaint, CTI alleges twelve counts of breach of contract, quantum meruit, and unjust enrichment based on oral contracts between the Defendants and CTI that were made in Abu Dhabi from October 2008 to July 2009.

CTI is a Florida limited liability company with two members: Fadi Kantar and Pierre Maroun.  CTI was formed in 2008 for the purpose of providing acquisition consulting services.  It has never generated any revenues.  The claims asserted in this case are CTI's sole asset.

Prior to July 2010, CTI's website listed offices in both Tampa, Florida, and Dubai, United Arab Emirates ("UAE").  CTI used business cards in 2009 that listed an UAE address and phone number.  From February 2009 to August 2009, Maroun was in the UAE.  From October 2008 to July 2009, Kantar was in the UAE except for brief trips to renew his visa.  According to Maroun, Kantar has not been in Florida in connection with CTI business since 2009 and currently resides in Lebanon.

IPIC is a foreign investment company with its principal place of business in Abu Dhabi.  IPIC is wholly-owned by and organized as an instrumentality of the Abu Dhabi government.  The Abu Dhabi government's primary purpose for creating IPIC was to make long-term strategic investments to diversify the country's assets.

At the time the complaint was filed, Aabar was a public joint stock company with its principal place of business in Abu Dhabi, it was listed on the Abu Dhabi Securities Exchange, and it was subject to the general corporate laws of the UAE.  Unlike IPIC, the government of Abu Dhabi did not create Aabar.  At the time of the filing of the complaint, IPIC owned 75.5% of Aabar's shares and the remaining 24.5% were owned by the public.

Tasameem is private limited liability company organized under the laws of Abu Dhabi and has its principal place of business there.  The government of Abu Dhabi had no role in the formation of Tasameem.

None of the three Defendants have ever maintained an office or place of business in Florida, been licensed to do business in Florida, or owned or leased any properties in Florida. None of the Defendants have been a party to a suit in Florida prior to the instant case. Likewise, none the of the Defendants have any financial accounts in Florida.

The Defendants are tied together by their shared leadership found in Mr. Khadem Al Qubaisi.  Al Qubaisi was at all times relevant Director of IPIC, Chairman of Aabar, and Chairman and Chief Executive Officer of Tasameem.  It is not disputed that Al Qubaisi had full authority to bind each of the three corporate Defendants.

In October 2008, Al Qubaisi met with Kantar in the UAE.  The record is disputed as to whether Al Aubaisi or Kantar initiated the meeting and what, if any, agreements were made at this meeting.  However, it is clear that Kantar intended to locate assets and companies for acquisition on behalf of IPIC and/or on behalf of all three Defendants.

CTI alleges that at this initial meeting it was agreed that CTI would be paid upon completion of locating and initiating contact with the present owner of certain assets, *not* upon completion of a sale transaction between one of the Defendants and the prospective seller.  In the amended complaint, CTI describes this oral contract as such:

> CTI would, in the case of unspecified assets that were described by Mr. Al Qubaisi by general nature, locate suitable targets and ascertain from the present owner that it was amenable for a sale.  In the case of specific targets, CTI would initiate contact with the present owner and conduct preliminary negotiations to ascertain that the sought asset was available for purchase. Upon completion of these tasks, CTI's work would be complete and CTI would be owed its fee.  Mr. Al Qubaisi set out the acquisition program and concomitant compensation and, on behalf of IPIC, Aabar and Tasameem, agreed.  For such services, Mr. Al Qubaisi, on behalf of Defendants IPIC, Aabar and Tasameem, agreed to payment of .5-2.5% of the asset's value.

Dkt. 19, Am. Compl., ¶¶ 19-20.

CTI alleges that Al Qubaisi engaged CTI as its agent and required it to exclusively work for Defendants.  The first three alleged acquisition targets were to be located within the United States.  The remaining acquisition targets were located abroad.  CTI alleges that Al Qubaisi ignored corporate formalities and would often instruct Kantar about new assignments without specifying for which Defendant CTI was working.  These acquisition projects and initial negotiation assignments continued until July 2009.

Significantly, CTI alleges that Defendants "agreed to make payment to CTI in the State of Florida."  Dkt. 19, Am. Compl., ¶ 14.  CTI also alleges that it performed most, if not all, of its contract obligations from its office in Florida.  The record seems to contradict this allegation given Maroun's deposition testimony that Kantar and himself were primarily in

the UAE during the relevant time periods.  However, it is undisputed that the Defendants never completed an investment in any of the proposed acquisition targets located by CTI.

CTI claims it "successfully completed the tasks assigned to it, and on or about July 10, 2009, Mr. Al Qubaisi verbally agreed to pay CTI $63,000,000 as its earned compensation.  However, no monies were received, and on or about July 13, 2009, CTI repeated its demand for payment by means of an invoice submitted to Mr. Al Qubaisi for payment for services rendered, and expenses, as agreed among the parties, for payment by Defendants."  Dkt. 19, Am. Compl., ¶¶ 24-25.  None of the Defendants has ever made any payment to CTI, either in the UAE or in Florida.  After CTI's demand for payment went ignored, CTI claims that Al Qubaisi threatened Kantar and Maroun if they returned to the UAE.

CTI alleges that this Court has jurisdiction over IPIC and Aabar because they are instrumentalities or organs of a foreign state and engaged in commercial activity having a direct effect in the United States, thus giving the Court subject matter jurisdiction under the Foreign Sovereign Immunities Act.  CTI alleges that this Court has diversity jurisdiction over Tasameem and personal jurisdiction through the Florida long-arm statute.  Alternatively, CTI alleges supplemental jurisdiction over Aabar and Tasameem.  CTI does *not* allege diversity jurisdiction over Aabar, nor does it allege that the Foreign Sovereign Immunities Act gives the Court jurisdiction over Tasameem.

After CTI filed its amended complaint, Defendants moved to dismiss the action based on lack of subject matter jurisdiction, lack of personal jurisdiction, *forum non coneniens*, and

failure to state a claim upon which relief can be granted.  Specifically, IPIC and Aabar object to the Court having subject matter jurisdiction over them through the Foreign Sovereign Immunities Act and Tasameem objects to the Court having personal jurisdiction over it.

On September 17, 2010, the Court stayed the case and ordered jurisdictional discovery. Dkt. 47.  Over the next two years, CTI deposed senior officers of each Defendant, propounded hundreds of discovery requests, filed twelve motions to compel further responses, and forced Defendants' counsel to attend six hearings in Florida related to CTI's motions.

In May 2012, Edward Saadi moved to intervene to assert a charging order against CTI to recover an outstanding judgment of $90,000 against Maroun.  In June 2012, the Court lifted the stay and ordered the Defendants to file a supplemental brief to their motion to dismiss and CTI to file a supplemental brief to its response opposing the motion to dismiss.

## <u>STANDARD OF REVIEW</u>

"Attacks on subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) come in two forms: "facial attacks" and "factual attacks." *Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256, 1260 (11th Cir. 1997).  "Facial attacks on the complaint 'require the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion.'" *Id.* at 1261 (quoting *Lawrence v. Dunbar,* 919 F.2d 1525, 1529 (11th Cir. 1990)). "Factual attacks, on the other hand, challenge 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and

affidavits, are considered.'" *Id.*  Because the court's very power to hear the case is at issue under a factual 12(b)(1) motion, the Court may hear conflicting evidence and decide on the factual issues so as to satisfy itself that jurisdiction exists.  *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003) (quoting *Lawrence*, 919 F.2d at 1529); *see also Colonial Pipeline Co. v. Collins*, 921 F.2d 1237, 1243 (11th Cir. 1991).  "In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional issue."  *Morrison*, 323 F.3d at 925 (quoting *Lawrence*, 919 F.2d at 1529).[1]

If a motion to dismiss asserts a lack of subject matter jurisdiction, the plaintiff bears the burden of showing that it has properly invoked the court's jurisdiction.  *Dominican Energy Ltd., Inc. v. Dominican Republic*, 903 F. Supp. 1507, 1511 (M.D. Fla. 1995).  If a motion to dismiss asserts a lack of personal jurisdiction over the defendant, the plaintiff must establish a *prima facie* case of personal jurisdiction to survive the motion to dismiss.  *Id.*  However, because subject matter jurisdiction involves the court's inherent authority to hear the case, it is "fundamentally preliminary" to the issue of personal jurisdiction.  *Id.*  Accordingly, the Court first addresses the subject matter jurisdiction authorized under the Foreign Sovereign Immunities Act and supplemental jurisdiction under 28 U.S.C. § 1367, then personal jurisdiction, and finally the *forum non conveniens* argument.

---

[1]District courts may not rely upon a 12(b)(1) jurisdictional challenge if the facts necessary to sustain jurisdiction implicate the merits of a plaintiff's cause of action.  *Morrison*, 323 F.3d at 925.  Here, the disputed jurisdictional facts do not implicate the underlying claims for breach of contract, unjust enrichment, or quantum meruit.

I.    **The Foreign Sovereign Immunities Act: Subject Matter & Personal Jurisdiction**

"The Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. § 1602, *et seq.*, establishes a comprehensive framework for determining whether a court in this country, state or federal, may exercise jurisdiction over a foreign state." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 610 (1992).[2]  Under the FSIA, a foreign state enjoys a presumption of immunity against jurisdiction in all courts of the United States unless one of the statutorily defined exceptions applies.  28 U.S.C. § 1604 (a "foreign state *shall* be immune from the jurisdiction of the courts of the United States") (emphasis added).  This immunity extends to "a political subdivision of a foreign state or an agency or instrumentality of a foreign state."  28 U.S.C. § 1605(a).  Hence, the statutory exceptions to FSIA's immunity provide the "sole basis" for obtaining subject matter jurisdiction over a foreign sovereign or an agency or instrumentality of a foreign sovereign.  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).

Once subject matter jurisdiction is established through one of the statutory exceptions to immunity, district courts also obtain personal jurisdiction over foreign states if "service has been made under section 1608."  28 U.S.C. § 1330(b); *see also Argentine Republic*, 488 U.S. at 434 n.3 ("[P]ersonal jurisdiction, like subject-matter jurisdiction, exists only when one of the exceptions to foreign sovereign immunity in §§ 1605-07 applies.").  Pursuant to

_____

[2]*See also Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 450 (6th Cir. 1987) (explaining that the subject matter jurisdiction granted to district courts by the FSIA in 28 U.S.C. § 1330(a) "is neither diversity nor alienage jurisdiction, but federal question jurisdiction.  It is a statutory grant of jurisdiction enacted by Congress pursuant to the "arising under" clause of Article III, Section 2, of the Constitution.")

§ 1608(b), service may be effectuated upon an agency or instrumentality of a foreign state "by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality." 28 U.S.C. § 1608(b)(1).  Under Federal Rule of Civil Procedure 5, any pleading filed after the original complaint, including an amended complaint, must be served on every party.  Fed. R. Civ. P. 5(a).  If a party is represented, service must be made on the party's attorney and may be sent by electronic means through the court's transmission facilities.  Fed. R. Civ. P. 5(b)(3).

In addition, constitutional due process protections extend to some entities of a foreign state depending on whether they are considered an agent of the foreign state.  *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 301 (D.C. Cir. 2005).  If the foreign state exerts sufficient control over the entity to create a relationship of principal to agent, then the entity loses its "person" status under the due process clause and the constitutional "minimum contacts" test need not be satisfied.  *Id.*

A.      **Standard of Review under the FSIA**

Ordinarily, the plaintiff bears the burden of presenting a *prima facie* case that jurisdiction exists.  *Butler v. Sukhoi Co.*, 579 F.3d 1307, 1313 (11th Cir. 2009).  However, when jurisdiction is alleged under one of the statutory exceptions of the FSIA, a defendant challenging subject matter jurisdiction has the initial burden of presenting a *prima facie* case that it is a foreign state entitled to immunity.  *Id.* at 1313 n.8.  Once a defendant meets this requirement,

the plaintiff must overcome the presumption that the foreign state is immune from suit by producing evidence that "the conduct which forms the basis of the complaint falls within one of the statutorily defined exceptions." Whether the plaintiff has satisfied his burden of production in this regard is determined by looking at the "allegations in the complaint and the undisputed facts, if any, placed before the court by the parties." Once the plaintiff demonstrates that one of the statutory exceptions to FSIA immunity applies, the burden then shifts to the defendant to prove, by a preponderance of the evidence, that the plaintiff's claims do not fall within that exception.

*Id.* at 1312-1313 (citations omitted).

## B.      Instrumentality Status under § 1603

Under the FSIA, "foreign state" includes "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). Congress has defined "agency or instrumentality" to mean any entity

(1) which is a separate legal person, corporate or otherwise, and
(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b). Based on the present tense of the statute, instrumentality status is determined at the time the suit is filed. *Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003).

Of pivotal importance are the meanings of the two clauses found in § 1603(b)(2), as either organ status *or* ownership of a majority of its shares by the foreign state can inculpate a corporation into the jurisdiction afforded district courts through the FSIA. *See, e.g., USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 199 (3d. Cir. 2003) (stating that "section 1603(b)(2)

is two-pronged"); *EIE Guam Corp. v. Long Term Credit Bank of Japan,* Ltd., 322 F.3d 635, 639 (9th Cir. 2003) (explaining there are two ways to fulfill the requirements of § 1603(b)(2)); *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 846 (5th Cir. 2000) (discussing whether Syrian corporation met requirements for both prongs of § 1603(b)(2)).

The second clause, majority ownership of a corporation, is the more definite of the two designations. The Supreme Court clearly stated that "only direct ownership of a majority of shares by the foreign state satisfies the statutory requirement." *Dole Food Co.*, 538 U.S. at 474. Rejecting the colloquial sense of ownership, the Supreme Court held that "Congress intended statutory coverage to turn on formal corporate ownership" and "[m]ajority ownership by a foreign state, *not control*, is the benchmark of instrumentality status." *Id.* at 474, 477 (emphasis added) (affirming the court of appeals' decision that denied instrumentality status to a subsidiary of an instrumentality because control by intermediate corporate tiers did not satisfy the statutory requirement of direct majority ownership).

Unfortunately, "there is no 'clear test' for determining agency or instrumentality status under the § 1603(b)(2) 'organ' prong." *Kelly*, 213 F.3d at 847; *see Alpha Therapeutic Corp. v. Nipon Hoso Kyokai*, 199 F.3d 1078, 1084 (9th Cir. 1999); *Supra Med. Corp. v. McGonigle*, 955 F. Supp. 374, 378-79 (E.D. Pa. 1997). "[T]he statute and legislative history are silent as to a definition of the term 'organ,' and that term inherently is vague and does not have a well-established common law meaning." *USX Corp.*, 345 F.3d at 207-08. Moreover, neither the Supreme Court nor the Eleventh Circuit have articulated a standard for deciding whether an entity is an organ, thus the Court must look to other circuit courts for guidance.

Four circuits have addressed the organ prong of § 1603(b)(2), and three of the four courts of appeals have applied identical standards. *See Filler v. Hanvit Bank*, 378 F.3d 213 (2d. Cir. 2004); *EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*, 322 F.3d 635 (9th Cir. 2003); *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841 (5th Cir. 2000). The capstone of organ designation is "whether the entity engages in a public activity on behalf of a foreign government." *EIE Guam Corp.*, 322 F.3d at 640. To make this determination, these three circuit courts consider the following five factors:

(1) whether the foreign state created the entity for a national purpose;

(2) whether the foreign state actively supervises the entity;

(3) whether the foreign state requires the hiring of public employees and pays their salaries;

(4) whether the entity holds exclusive rights to some right in the [foreign] country; and

(5) how the entity is treated under foreign state law.

*Filler*, 378 F.3d at 217; *EIE Guam Corp.*, 322 F.3d at 640; *Kelly*, 213 F.3d at 846-47. These factors provide a helpful framework, but not all five are required to make an organ determination. *Kelly*, 213 F. 3d at 847; *EIE Guam Corp.*, 322 F.3d at 641 (balancing the five factors and concluding they weighed in favor of an organ designation).

The fourth court, the Third Circuit, added the additional factor of "ownership structure of the entity." *USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 209 (3d. Cir. 2003). However, this additional factor drastically alters the analysis in cases involving tiered corporate

ownership and circumvents the reasoning of the Supreme Court in *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003) (holding that the tiering theory of sovereign immunity was not allowed under the majority ownership prong of § 1603(b)(2) when indirect control is asserted on a subsidiary through an instrumentality of a foreign state, without direct majority stock ownership of the subsidiary by the foreign state).   Adherence to the Third Circuit's extra prong would almost certainly eviscerate the Supreme Court's careful analysis of Congressional intent behind § 1603(b)(2).[3]  Due to this inconsistent outcome and because of the uniformity among three circuit courts, the Court adopts the five-prong factor test as articulated by the Second, Fifth, and Ninth Circuits.  *Filler*, 378 F.3d at 217; *EIE Guam Corp.*, 322 F.3d at 640; *Kelly*, 213 F.3d at 846-47.

In its amended complaint, CTI alleges FSIA jurisdiction over IPIC and Aabar.[4]  IPIC clearly qualifies as an instrumentality and thereby is included in § 1603's definition of a

---

[3]The Third Circuit stresses that it does not run afoul of *Dole* because it found "that, although Congress favored ownership over control in the majority ownership prong, its use of the word 'organ' suggests an emphasis on control under the organ prong."  *USX Corp.*, 345 F.3d at 211. However, that conclusion nullifies the particular terms Congress selected in the statute, thereby opening the organ prong for all minority held corporations to become instrumentalities when they do not qualify under the majority ownership prong because they are controlled through tiered corporate intermediaries.  Moreover, the ownership structure is more appropriately addressed in the majority ownership prong, not the organ prong which focuses on entities carrying out public functions on behalf of the foreign state.

[4]In Plaintiff's Supplemental Memorandum in Opposition to Defendants' Motion to Dismiss Amended Complaint (Dkt. 142), CTI argues that discovery subsequent to its Amended Complaint confers subject matter jurisdiction on the Court over Tasameem through the commercial activity exception under the FSIA.  The Court previously denied CTI's motion for leave to file a second amended complaint to add allegations that Tasameem is an "organ" of the Abu Dhabi government but stated that CTI may renew such a motion at the close of the jurisdictional discovery period (Dkt. 86).  A review of the docket shows that no such motion has been filed.  Therefore, the Court only analyzes jurisdiction over Tasameem as alleged in CTI's Amended Complaint (Dkt.19).

"foreign state."  Indeed, IPIC admits it "is wholly-owned by and organized as an instrumentality of the Abu Dhabi government."  In order to exercise subject matter jurisdiction over IPIC, the Court must determine that an exception to immunity applies.  The Court discusses in the following subsection that the commercial activity exception as defined in 28 U.S.C. § 1605(a)(2) applies to give the Court subject matter jurisdiction over IPIC.

Aabar, on the other hand, adamantly denies being an instrumentality of the Abu Dhabi government.  Plainly, Aabar satisfies the requirements of § 1603(b)(1) and (b)(3), as the parties do not even address these prongs of the instrumentality analysis in their briefs, and the record supports the finding that Aabar is a corporation organized under the laws the UAE, not any third country.

Thus, in order to qualify as an instrumentality, CTI must make a *prima facie* showing that Aabar satisfies either prong of § 1603(b)(2).  The burdens of production are unusual here.  Normally, when jurisdiction is alleged under one of the statutory exceptions of FSIA, a defendant challenging subject matter jurisdiction has the initial burden of presenting a *prima facie* case that it is a foreign state entitled to immunity.  *Butler*, 579 F.3d at 1313 n.8. Presently, however, Aabar does *not* claim instrumentality status with its accompanying immunity; thus, CTI must make a *prima facie* showing that Aabar is an organ *and* engaged in commercial activity.  Aabar can then rebut this *prima facie* showing by proving by a preponderance of the evidence that it is *not* an instrumentality and did not engage in behavior falling within the commercial activity exception. *See Scheidemann v. Qatar Football Ass'n*, 2008 WL 144846, *4 (S.D.N.Y. Jan. 15, 2008) (explaining the reversed burdens because

"Plaintiff is in the unusual position of having to first show that the defendants are organs of the Qatari government (presumptively giving them immunity) and then that one of FSIA's exceptions applies (removing such immunity)").

Because neither the government of Abu Dhabi nor the UAE directly owned any stock in Aabar at the time of the amended complaint's filing,[5] the second prong of § 1603(b)(2) cannot apply to draw Aabar within the reach of FSIA's instrumentality status. *See Dole Food Co.*, 538 U.S. at 474-77 (rejecting the argument that indirect ownership through intermediate corporate tiers qualifies as majority ownership under § 1603(b)(2) and interpreting FSIA to require formal corporate ownership of an entity).

The contentious determination, particularly because of the flexibility in applying the organ test, is whether Aabar is an organ of Abu Dhabi in conformity with the first prong of § 1603(b)(2). No single factor is determinative. *USX Corp.*, 345 F.3d at 209-10 (explaining that the Courts of Appeals for the Ninth and Fifth Circuits balance these five factors, not mechanically demand all five be met).

CTI alleges in its amended complaint that "Aabar is an instrumentality of the government of Abu Dhabi, being an organ of said government. It was founded by the sovereign wealth fund of the government of Abu Dhabi, and upon information and belief acts on behalf of and is directed by the government of Abu Dhabi." Under the test articulated above, this jurisdictional allegation is skeletal at best and only addresses two of the five

---

[5]The Supreme Court has instructed that instrumentality status is to be determined at the time the suit is filed. *Dole Food Co.*, 538 U.S. at 478.

factors for consideration.  However, because the jurisdictional challenge is factual instead of facial, the Court will decide the factual disputes based on the jurisdictional discovery that has occurred over the last two years.

### i. Creation and Purpose of Aabar

Aabar was *not* created by the government of Abu Dhabi.  Aabar's corporate representative and Chief Executive Officer, Mr. Mohamed Ahmed Badawy Al-Husseiny, testified in his deposition that Aabar was created in 2005 by five individuals, all of whom were former directors at the Abu Dhabi National Oil Company ("ADNOC").  Dkt. 142-6, Aabar Corp. Rep. Dep. at 49:19-52:12.  However, none of these men were still with ADNOC at the time of Aabar's creation.  Furthermore, Aabar was founded as a "public joint stock company in accordance with the provisions of Federal Law No. 8/1984 on Commercial Companies." Dkt. 152-13, Aabar's Art. of Ass'n.  As such, its initial capital was divided into 900 million shares, 405 million of which were subscribed by the founding members and the other 495 million shares were offered in a public offering.  *Id.*  It is irrelevant that some of these initial shareholders were also members of the royal family, as creation by the foreign state for a public purpose is the relevant inquiry, not the personal investments of a nation's leaders.  *See, e.g., EIE Guam Corp.*, 322 F.3d at 640-41 (holding Japanese corporation as organ in part because Japanese government created it pursuant to several laws enacted by the Japanese Diet to perform a public function); *Filler*, 378 F.3d at 217-18 (holding Korean corporation as organ because formed by statute and presidential decree for functions traditionally performed by the government); *Kelly*, 213 F.3d at 848 (holding Syrian

corporation as organ in part because "created by Syrian government decree for national purpose: the development and exploration of Syria's mineral resources").[6]

Likewise, Aabar was *not* created for a national purpose. According to Article 5 of Aabar's Articles of Association, the company's objective was to "[i]nvest in, establish, and run business and industrial projects, including the acquisition of companies operating in the oil and gas sector" and to "enhance the value or increase the profitability of all or part of the Company's undertakings, properties, and assets, and bolster the Company's interests or stakeholders."  Dkt. 152-13, Aabar's Art. of Ass'n.  This purely commercial venture is affirmed by Mr. Al-Husseiny's deposition.  Dkt. 142-6 at 49:17-22 (stating his advisory capacity was to assist Aabar in forming "the publicly listed entity, and then use it as a platform to grow in the oil and gas business.").

CTI does not refute that Aabar's original creation and purpose was independent of the Abu Dhabi government.  Instead, CTI argues that IPIC's 71% stock ownership of Aabar as of April 7, 2009, and IPIC's subsequent increased ownership up to 95.3% constitutes indirect acquisition by the government.[7]  This is patently irrelevant because CTI inaccurately equates IPIC with the Abu Dhabi government.  They are not interchangeable with regards to § 1603

---

[6]Although the Court rejects the additional prong added by the Third Circuit, it should be noted that the Third Circuit found it uniquely important to its holding that the Irish corporation was an organ because it was acquired and structured to serve a national purpose through a legislative act. *USX Corp.*, 345 F.3d at 210.

[7]The filing date of the complaint is the relevant date for determining instrumentality status. *Dole Food Co.*, 538 U.S. at 478.  In Mr. Al-Husseiny's declaration dated July 5, 2010, he stated Aabar is listed on the Abu Dhabi Securities Exchange and that IPIC owns 75.5% of Aabar's shares.

because IPIC does not become a "foreign state;" rather, IPIC is *subsumed* within the term "foreign state" but does not possess the ability to confer instrumentality status on other corporate entities. *Filler*, 378 F.3d at 219 (explaining that § 1603(a) uses the term "includes" instead of "is defined" in order to prevent recursive tiering).

CTI also advances numerous press releases, website clips, and media reports as evidence that Aabar's true purpose is to "bring benefit back to Abu Dhabi" and "to create social and economic benefits for Abu Dhabi and the United Arab Emirates." But incidental benefits to a foreign state because the corporation is located there do not qualify as serving a public function, nor do colloquial references to government control suffice to bestow instrumentality status. *See, e.g., Supra Med. Corp.*, 955 F. Supp. at 378 (holding a medical and dental school, even though created by an act of the British Parliament and 70% funded by the British government, was not an organ because it did not "serve any peculiar national or governmental purpose in Great Britain"). The key inquiry is whether the entity serves primarily a private interest, such as profit maximizing, or a public interest, such as industry protection or economic stabilization. *USX Corp.*, 345 F.3d at 215;[8] *EIE Guam Corp.*, 322 F.3d at 640-41 (stating a Japanese corporation was an organ because the Japanese Diet

---

[8]    *Most importantly*, while the companies in *Patrickson* were created for purposes of exploiting Dead Sea resources for profit, a venture that would have been appropriate for undertaking by a private company, Ireland indirectly acquired [defendant] in furtherance of the important national and inherently public interest of protecting the Irish insurance and banking industries from financial disaster and to maintain stability in the Irish economy.

*Id.* (emphasis added).

created for it for the purpose of carrying out "Japanese national policy related to revitalization of the Japanese financial system"). Here, Aabar, albeit beneficial to Abu Dhabi and the UAE, was created to invest in businesses to bring its shareholders a profit. That is not a national or public purpose.

Therefore, the creation and purpose factor weighs in favor of finding that Aabar is *not* an organ of Abu Dhabi.

### ii. Government Supervision of Aabar

CTI argues that Aabar is actively supervised by the government because IPIC officials constitute four of the five board members of Aabar, Mr. Khadem Al Qubaisi is the Chairman of Aabar and the Managing Director of IPIC, Aabar's board meets at IPIC's offices, and Aabar receives "interest free" loans from IPIC. Notably, all these facts relate to IPIC's involvement with Aabar, *not* Abu Dhabi's supervision of Aabar. As such, they are not relevant to the inquiry of government supervision because IPIC is treated as a distinct and separate entity from the government. *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 626-27 (1983) ("Due respect for the actions taken by foreign sovereigns and for principles of comity between nations leads us to conclude . . . that government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such.").

According to Aabar's CEO and its Articles of Association, Aabar is governed by a five-member board of directors who are appointed by Aabar's shareholders at an annual general meeting. (Dkt. 152-6; 152-13). The government does not appoint Aabar's directors,

nor are the directors required to report to any government official. *Id.* CTI does not refute these facts, but objects that because Aabar's Chairman is also the Managing Director of IPIC and in his IPIC capacity reports to Sheikh Mansour, the Minister of Presidential Affairs, there is a "deep inherent degree of government control and supervision" over Aabar. But that is not the same thing as state-sanctioned, active supervision through formal reporting mechanisms or appointments. *See Alpha Therapeutic Corp.*, 199 F.3d at 1084 (finding a Japanese television broadcasting corporation an organ in part because its programming had to satisfy government-mandated goals, board members were appointed by the prime minister with the consent of the parliament, and the board was supervised by a government minister).

CTI again confuses IPIC and Abu Dhabi in relation to IPIC's financial contributions. Loans from IPIC are not loans from the government, and CTI does not dispute that Aabar's debts and liabilities are not guaranteed by the government of Abu Dhabi or the UAE.

Therefore, the lack of formal government supervision and funding cuts against Aabar being designated an organ of Abu Dhabi.

### iii.   Employment of Public Employees by Aabar

CTI does not assert that Aabar employs civil servants, much less that the government of Abu Dhabi or the UAE requires it. This factor favors Aabar not being designated an organ of Abu Dhabi.

### iv.   Exclusive Rights Held by Aabar

CTI does not allege that Aabar retains any special privileges or exclusive rights from the government. Moreover, Aabar presents its CEO's declaration that "it has not been

granted any exclusive right or protection by the government." (Dkt. 152-6)  As this is all the evidence pertaining to exclusive rights, this factor also weighs against Aabar being found an organ of Abu Dhabi.

### v.       Treatment of Aabar under UAE Law

Aabar is governed by the Companies Laws of the UAE and, at the time of the complaint, the rules of the Abu Dhabi stock exchange.  CTI does not rebut this evidence. Therefore, this factor weighs against a finding of organ status.

In sum, the linchpin of the organ analysis is "whether the entity engages in a public activity on behalf of a foreign government." *EIE Guam Corp.*, 322 F.3d at 640.  Yet CTI cannot identify one unique public purpose Aabar carries out on behalf of the Abu Dhabi government; rather, it relies upon media characterizations and press releases that colloquially refer to the control that Abu Dhabi exerts on Aabar through IPIC.  Of key importance is that Aabar's purpose is fundamentally to make a profit for its shareholders.  It does not receive special treatment from the government, it does not hire public servants, it is not funded through the government, and it is not supervised by the government.  All factors strongly point against a finding of organ status, and the Court finds Aabar is not an organ of either the government of Abu Dhabi or the UAE.  Therefore, the Court cannot exercise subject matter jurisdiction over Aabar through the FSIA.

### C.       Commercial Activity Exception Applies to IPIC

The most significant of FSIA's exemption from immunity to suit in the courts of the United States is the commercial activity exception found at § 1605(a)(2).  *Weltover*, 504 U.S.

at 611.  Under the commercial activity exception, a foreign state shall not be immune from

suit in any case

> in which the action is based upon a commercial activity carried on in the
> United States by the foreign state; or upon an act performed in the United
> States in connection with a commercial activity of the foreign state elsewhere;
> or upon an act outside the territory of the United States in connection with a
> commercial activity of the foreign state elsewhere and that act causes a direct
> effect in the United States.

28 U.S.C. § 1605(a)(2).  The FSIA defines "commercial activity" to mean "either a regular

course of commercial conduct or a particular commercial transaction or act.  The commercial

character of an activity shall be determined by reference to the nature of the course of

conduct or particular transaction or act, rather than by reference to its purpose."  28 U.S.C.

§ 1603(d).

The commercial exception "largely codifies the so-called 'restrictive' theory of

foreign sovereign immunity," meaning immunity only attaches to causes of action arising

from a foreign state's governmental acts.  *Guevara v. Republic of Peru*, 468 F.3d 1289, 1295

(11th Cir. 2006) ("*Guevara I*").  Entering into a contract clearly qualifies as "commercial

activity" under the FSIA because it is not a sovereign act.  *See, e.g., id.* at 1298 (The

Eleventh Circuit acknowledged that "registering aircraft under the Honduras flag is an act

peculiar to its sovereignty," but that "contracting for services was a commercial act" bringing

it within the commercial activity exception); *Samco Global Arms, Inc. v. Arita*, 395 F.3d

1212, 1216 (11th Cir. 2005) ("This Circuit has held that where the activity at issue involves

a government's contract for purchase and sale of goods, the activity is commercial, and not

sovereign.").  "What [a contract] mandates is that the state pay the promised amount for the other party's performance.  Paying an amount owed under a contract is not itself a sovereign act."  *Guevara I*, 468 F.3d at 1300.  And the purpose of the contract, even if a national interest, is irrelevant.  28 U.S.C. § 1603(d).  Only the *nature* of the conduct or act is important, so that a contract to purchase information, even in a not-for-profit sense, is still commercial activity within the breadth of the FSIA exception.  *Guevara I*, 468 F.3d at 1302-03.

FSIA's term "direct effect" means one that follows "as an immediate consequence of the defendant's . . .  activity."  *Weltover*, 504 U.S. at 618 (1992).  "[I]n cases where a plaintiff's claim is for breach of a contract providing that payment or performance must be made in the United States, the 'direct effect' requirement has been deemed satisfied."  *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 710 (9th Cir. 1992); *see Weltover*, 504 U.S. at 619 ("Because New York was thus the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a 'direct effect' in the United States."); *Chisholm & Co. v. Bank of Jamaica*, 643 F. Supp. 1393, 1401 (S.D. Fla. 1986) ("The failure to pay an American corporation in the United States creates a direct effect 'in' the United States."); *contra Can-Am Int'l, LLC, v. Republic of Trinidad & Tobago*, 169 Fed. App'x 396, 407 (5th Cir. 2006) (finding no direct effect in the United States based on a plaintiff's contractual expectation to be compensated in the United States because the only direct effect was financial loss based on the alleged breach of contract).

CTI lists numerous commercial activities of IPIC that are completely unrelated to the alleged oral contract giving rise to CTI's causes of action.  These commercial activities are irrelevant to the determination of whether IPIC's involvement with CTI falls within the commercial exception to the FSIA.  *See Can-Am Int'l, LLC*, 169 Fed. App'x at 405 (stating that courts require a significant nexus between the commercial activity in the United States and a plaintiff's cause of action).  The commercial activity having a direct effect in the United States must relate to the cause of action being alleged.

CTI attempts to establish jurisdiction over IPIC through prongs one and three of the commercial exception of the FSIA.  CTI alleges in its amended complaint that it conducted negotiations and work on behalf of IPIC from Florida, and its activities were imputed to IPIC as "commercial activity carried on in the United States by the foreign state."  The Court concludes there is no merit to this argument because the commercial acts must be of the named defendant and CTI has failed to prove it was an agent of IPIC thereby attributing CTI's actions to IPIC.  *See Can-Am Int'l, LLC*, 169 Fed. App'x at 406.

The recondite determination is whether the alleged breach of the oral contracts had a direct effect in the United States, and thereby would satisfy the third prong of the commercial activity exception.  CTI alleges in its amended complaint that IPIC promised to make contractual payments in Florida.  Kantar and Maroun both submitted declarations stating, "Pursuant to the contract between CTI and Defendants, all payments to CTI were to be made in the State of Florida."  Dkt. 39-1, 39-2.  As discussed above, entering into a

contract is clearly commercial activity and a failure to perform a contractual obligation to pay in the United States qualifies as a "direct effect" under the third prong.

Because this motion to dismiss is a factual dispute, not merely a facial attack, IPIC could avoid this jurisdictional exception by producing conflicting evidence that would enable the Court to satisfy itself that jurisdiction does not exist.  However, IPIC does not point to any *contradictory* evidence in the record about the location of payment.[9]  The mandates issued by IPIC do not conflict with the allegation of payment in Florida; the mandates do not mention payment at all.

Although the allegations of an oral contract requiring payment in Florida seem tenuous at best, the Court cannot say they are implausible and must accept them as true in light of the lack of conflicting evidence.  Thus, the Court concludes CTI has sufficiently shown the commercial exception applies to allow the Court to exercise subject matter jurisdiction over IPIC.

### D.       Personal Jurisdiction Over IPIC

CTI properly effectuated service of the original complaint and summons on all three Defendants through service on their counsel on June 9, 2010. (Dkt. 18).  After the complaint, any subsequent pleading may be served upon a party's attorney through the court's electronic transmission facilities.  Fed. R. Civ. P. 5(b)(e).  Thus, CTI's filing of the amended complaint

---

[9]For example, a declaration by Mr. Al Qubaisi stating that he never agreed to make payments in Florida would have sufficed to create a disputed fact.

on the CM/ECF system sufficiently served all three Defendants and fulfilled § 1608's requirements in order for this Court to obtain personal jurisdiction over IPIC.

In addition to the statutory personal jurisdiction requirements, IPIC argues that it is entitled to due process protections absent a showing that IPIC is so extensively controlled by the Abu Dhabi government that it became its agent. *See TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 301 (D.C. Cir. 2005). CTI responds that IPIC is completely controlled and directed by the Abu Dhabi government so as to be treated as a foreign state which is not a "person" under the due process clause and therefore not entitled to the protections of the "minimum contacts" test.

CTI bears the burden to make a *prima facie* showing that personal jurisdiction exists over IPIC by presenting evidence that IPIC is an agent of Abu Dhabi. CTI has met its burden and IPIC has not rebutted the *prima facie* showing. IPIC's board of directors are appointed by Emiri Decree, IPIC is a "government-owned and controlled entity," and IPIC is completely funded by the Abu Dhabi government. Dkt. 142-2, 14:11-13, 16:1-5. From these structural features it is apparent that IPIC is an agent of the Abu Dhabi government and should not be treated as an independent juridical entity. *See TMR Energy Ltd.*, 411 F.3d at 302 (finding a Ukrainian entity an agent of Ukraine because the parliament created it, its purpose was to implement national policies, it was accountable to the government, board members must be approved by the government, and it was funded by the government). Therefore, IPIC is not a "person" for purposes of the due process clause and cannot invoke the minimum contacts test to avoid personal jurisdiction by this Court.

In sum, the Court has subject matter and personal jurisdiction over IPIC under the FSIA, but it does not have jurisdiction over Aabar under the FSIA.

## II.    Supplemental Jurisdiction Over Aabar and Tasameem

CTI alleges supplemental jurisdiction over Aabar and Tasameem pursuant to 28 U.S.C. § 1367.  Section 1367 grants federal courts subject matter jurisdiction over state claims which arise from "the same case or controversy" as an action upon which the federal court has original jurisdiction. 28 U.S.C. § 1367(a).  However, this supplemental jurisdiction requires that the federal court have "no independent basis for subject matter jurisdiction." *See New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1505 (9th Cir. 1996).  Here, the Court has diversity jurisdiction over claims against both Aabar and Tasameem pursuant to 28 U.S.C. § 1332(a).  However, CTI never alleged diversity jurisdiction over Aabar, thus, the Court will not exercise it.

Accordingly, the Court has no subject matter jurisdiction over Aabar and must dismiss all claims against it.[10]  The Court does have diversity jurisdiction over claims against Tasameem, but for reasons stated below, cannot exercise jurisdiction over it because of lack of personal jurisdiction.

## III.   Lack of Personal Jurisdiction Over Tasameem

In its supplemental response to the motion to dismiss, CTI ignores its amended complaint allegations of personal jurisdiction over Tasameem through the Florida long-arm

---

[10]Even if CTI were permitted to amend its complaint again to add diversity jurisdiction over Aabar, the Court doubts it would have personal jurisdiction over Aabar for the same reasons it lacks personal jurisdiction over Tasameem.

statute and instead argues that Tasameem is an "organ" under the FSIA.  As previously discussed, the Court has declined to allow CTI to amend its complaint to add the FSIA as a basis for jurisdiction over Tasameem.  Instead, the Court concludes that personal jurisdiction is lacking over Tasameem through the Florida long-arm statute.[11]

Personal jurisdiction over a defendant requires two things: (1) the complaint must allege sufficient facts to satisfy one of the jurisdictional criteria contained in Florida's long-arm statute and (2) the exercise of personal jurisdiction must comport with the Constitution's due process clause.  *See Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990).  CTI alleges personal jurisdiction over Tasameem based on Fla. Stat. § 48.193(1)(a).

Florida Statute § 48.193(1)(a) provides that a defendant, "whether or not a citizen or resident of this state," is subject to the jurisdiction of Florida courts "for any cause of action arising from the doing of any of the following acts: (a) operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state."

In order to establish personal jurisdiction over a defendant through the "carrying on a business" prong of the long-arm statute, the plaintiff must show the defendant's activities evince "a general course of business activity in the state for pecuniary benefit."  *Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.*, 421 F.3d 1162, 1167 (11th Cir. 2005) (quoting *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir.

---

[11] The amended complaint does not assert personal jurisdiction over Aabar through the Florida long-arm statute; therefore the Court does not address Aabar's contacts with the forum.

2000)).   The Eleventh Circuit has identified several relevant factors to consider: "the presence and operation of an office in Florida, the possession and maintenance of a license to do business in Florida, the number of Florida clients served, and the percentage of overall revenue gleaned from Florida clients." *Id.* Additionally, "[t]he Long-Arm provision requires that a defendant conduct business in Florida, and therefore conducting business from a[n] [out-of-state] office *as if* in Florida is insufficient under the plain text of the statute." *Id.* (emphasis in original).

Tasameem undoubtedly has not engaged in "a general course of business" in Florida. Tasameem does not have an office or agent in Florida, is not licensed to do business in Florida, nor does it serve clients in Florida.   All of Tasameem's interactions with CTI occurred in Abu Dhabi or Saudi Arabia.   Tasameem did not solicit investments in Florida. Presumably, CTI neglects to argue jurisdiction based on Fla. Stat. § 48.193(1)(a) because it cannot possibly prove any of Tasameem's actions support the "carrying on a business" prong of the long-arm statute.[12]

Accordingly, because the Court lacks personal jurisdiction over Tasameem, it must dismiss all counts against it.

---

[12]CTI mentions Tasameem's 90% ownership interest in Hakkasan Ltd., a company incorporated in the United Kingdom with its principal place of business in London.  Hakkasan manages a restaurant owned by Fontainebleua Florida Hotel, LLC, in Florida.  However, CTI did not allege general jurisdiction over Tasameem, and specific jurisdiction requires that a plaintiff's claims "arise from" the defendant's business activities in Florida.  *See* Fla. Stat. § 48.193(1).

IV.   *Forum Non Conveniens*

"A federal court has discretion to dismiss a case on the ground of *forum non conveniens* when an alternative forum has jurisdiction to hear the case, and trial in the chosen forum would establish oppressiveness and vexation to a defendant out of all proportion to plaintiff's convenience, or the chosen forum is inappropriate because of considerations affecting the court's own administrative and legal problems." *J.C. Renfroe & Sons, Inc. v. Renfroe Japan Co., Ltd.*, 515 F. Supp. 2d 1258, 1265 (M.D. Fla. 2007) (citations omitted). For a court to dismiss an action based on *forum non conveniens*, the party seeking dismissal must establish that "(1) an adequate alternative forum is available, (2) the public and private factors weigh in favor of dismissal, and (3) the plaintiff is able to reinstate his suit in the alternate forum without undue inconvenience or prejudice." *Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1311 (11th Cir. 2001).

Although detailed affidavits are unnecessary, a defendant seeking dismissal based on *forum non conveniens* must submit sufficient information upon which a court can balance the parties' interests. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 258-59 (1981).  A court may rely upon the parties' submissions of proof in support or opposition to the motion, including affidavits presented by the parties.  *J.C. Renfroe & Sons*, 515 F. Supp. 2d at 1266.

The first prong of the *forum non conveniens* test requires two distinct inquiries: "whether the alternative forum is adequate and available." *Tazoe v. Airbus S.A.S.*, 631 F.3d 1321, 1330 (11th Cir. 2011) (quoting *Aldana v. Del Monte Fresh Produce N.A.*, 578 F.3d

1283, 1290 (11th Cir. 2009)); *see Leon*, 251 F.3d at 1311 ("Availability and adequacy warrant separate consideration.").

CTI does not dispute that the UAE is an available forum. "An alternative forum is 'available' to the plaintiff when the foreign court can assert jurisdiction over the litigation sought to be transferred." *Leon*, 251 F.3d at 1311. Thus, the available forum consideration is satisfied when the defendant is "amenable to process" in the alternative jurisdiction. *Tazoe*, 631 F.3d at 1330 (quoting *Piper Aircraft*, 454 U.S. at 254 n.22). Because all three defendants are companies organized under the laws of the UAE and subject to the jurisdiction of its courts, they are amenable to process in Abu Dhabi's courts. *See* Dkt. 152-21, Ex. U, Ghosheh Decl., ¶ 13 ("Since Defendants named in the Amended Complaint are all domiciled in the Emirate of Abu Dhabi with their principal place of business in Abu Dhabi, Abu Dhabi courts have jurisdiction over each of the Defendants.").

The more troublesome consideration is whether UAE provides an adequate forum. "An alternative forum is inadequate 'if the remedy provided by that alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all.'" *Tazoe*, 631 F.3d at 1330-31 (quoting *Piper Aircraft*, 454 U.S. at 254). However, an adequate forum need not be a "perfect forum" and "[t]he prospect of a lesser recovery does not justify refusing to dismiss." *J.C. Renfroe & Sons*, 515 F. Supp. 2d at 1268.

According to the declaration of Ali H. Ghosheh submitted on behalf of the Defendants, the UAE recognizes causes of action similar to CTI's claims in this case, including breach of contract, quantum meruit, and unjust enrichment. Dkt. 152-21, Ex. U,

¶ 14.[13]  However, any judgment obtained against the government, presumably this includes IPIC because it is a self-proclaimed "wholly-owned instrumentality" of Abu Dhabi, cannot be enforced through an order of attachment against the government's property.  *See id.* at ¶ 11.  Therefore, CTI, even if successful on the merits, would be without a method of enforcing a remedy against IPIC.  This legal disability to attach government property in the UAE is tempered by Mr. Ghosheh's declaration that "during my 35 years of practice, through which I have obtained many judgments against a government entity, I have not encountered a situation in which the government entity refused to abide by a judgment against it or otherwise oppose the enforcement of a money judgment." *Id.*  Additionally, judgments could be enforceable against Aabar and Tasameem,[14] thereby only *reducing* CTI's recovery in the UAE forum, not preventing recovery at all.  Finally, other courts have found the UAE to be an adequate forum.  *See, e.g., Payne v. Jumeirah Hospitality & Leisure (USA) Inc.*, 808 F. Supp. 2d 604, 605 (S.D.N.Y. 2011); *Zaveri v. E.F. Hutton & Co. Inc.*, 1986 WL 4063, *2 (S.D.N.Y. Apr. 1, 1986); *Abiaad v. Gen. Motors Corp.*, 538 F. Supp. 537, 543 (E.D. Pa. 1982).

Finding the UAE an available adequate forum, the Court now turns to the balancing of private interests.  "Pertinent private interests of the litigants include relative ease of access

---

[13] Mr. Ali H. Ghosheh is the managing partner of Ali H. Gosheh & Partners, an UAE law firm located in Abu Dhabi.  Mr. Ghosheh received his law degree from Damascus University in 1961, practiced in Jordan for over a decade, and then became licensed in the UAE in 1976.

[14]This Court makes no determination of UAE law concerning the status of Aabar or Tasameem's assets as "public funds owned by the state or an emirate" under Article 247 which prohibits attachment of government property.  *See* Dkt. 152-21, Ex. U, ¶ 11.

to evidence in the competing fora, availability of witnesses and compulsory process over them, the cost of obtaining evidence, [] the enforceability of a judgment," *Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1356 (11th Cir. 2008) (citations omitted), and "all other practical problems that make trial of a case easy, expeditious, and inexpensive." *C.A. La Sequridad v. Transytur Line*, 707 F.2d 1304, 1307 (11th Cir. 1983) (citations omitted). When weighing the private factors, "positive evidence of unusually extreme circumstances" must exist and a court should be "thoroughly convinced that material injustice is manifest" before dismissing a domestic plaintiff from this country's courts. *SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1102 (11th Cir. 2004); *see also King v. Cessna Aircraft Co.*, 562 F.3d 1374, 1382 (11th Cir. 2009) ("[A] plaintiff's choice of forum should rarely be disturbed. The presumption in favor of the plaintiff's forum choice is strongest when the plaintiff is a United States citizen, resident, or corporation."). However, an American plaintiff's choice of its home forum is not entitled to dispositive weight. *Reyno*, 454 U.S. 256 n.23. These factors are not exhaustive and district courts are given flexibility in assessing the private burdens upon parties. *King v. Cessna Aircraft Co.*, 562 F.3d 1374, 1381-82 (11th Cir. 2009). Moreover, "[a] trial court will look at the private interests first and then, if the balance of the private interests are found to be in equipoise or near equipoise, it will determine whether or not factors of *public* interest tip the balance in favor of a trial in a foreign forum." *Id.* at 1382 (citations omitted).

To begin, the Court addresses the presumption in favor of retaining jurisdiction based on an American plaintiff's choice of forum. CTI's status as a U.S. company and likewise

choice of forum deserves less deference than a U.S. citizen when the specific facts of this case are more closely examined. CTI is a defunct limited liability company registered in Florida with only two members: Fadi Kantar and Pierre Maroun. *See* Dkt. 152-4, Maroun Depo., at 27:15-23; *see* www.sunbiz.org, Fl. Dep't of State Div. of Corps. Since it's inception in 2008, CTI has *never* had any revenue, much less a profit, and it's only prospective clients are the three named Defendants to the extent they are liable for their oral contracts alleged in the amended complaint. Dkt. 152-4, Maroun Depo. at 28:1-20, 30:4-7. Furthermore, Kantar, CTI's only witness with first-hand knowledge of the alleged oral contracts made with the Defendants, lives in Lebanon with his son where he has spent a significant, if not the majority, amount of his time over the last two years. Dkt. 152-4, Maroun Depo. at 22:13-18, 80:10-81:6. According to Maroun, he has not seen Kantar in Tampa, Florida, the registered principal place of business for CTI, since at least 2009. Finally, both Kantar and Maroun handed out business cards with UAE telephone numbers, fax numbers, and a P.O. Box mailing address, although both men submitted declarations adamantly denying ever maintaining a business office in Abu Dhabi. Dkt. 152-11. As such, unlike an American citizen, CTI's corporate residence in the United States and corresponding convenience of litigating the dispute in this Court cannot fairly be entitled to as much weight as an American citizen who resides in the United States.

Besides the presumption in favor of a plaintiff's choice of forum, the remaining private interests weigh strongly in favor of dismissal. Because the causes of action are premised upon oral contracts entered into in Abu Dhabi with three Abu Dhabi companies,

little documentary or physical evidence exists beyond correspondence already in CTI's possession. Rather, the case centers on testimony of witnesses. In CTI's Rule 26 Initial Disclosures (Dkt. 29-15), CTI identifies fifteen individuals "likely to have discoverable information," nine of whom are located in the UAE and one in Jordan. Two of the remaining five witnesses are CTI's only members. Thus, the overwhelming majority of witnesses are located in the UAE, not in the United States. CTI claims that most of the witnesses located abroad are employees of the Defendants, thus under their control and can be brought to either forum without need of any compulsory process. *See Lueck v. Sundstrand Co.*, 236 F.3d 1137, 1146 (9th Cir. 2001). Although a compulsory process might not be necessary for most of the witnesses, that fact is irrelevant to the obvious inconvenience of dragging the majority of the witnesses from the UAE to the United States. *See Aldana v. Del Monte Fresh Produce N.A., Inc.*, 578 F.3d 1283, 1292 (11th Cir. 2009) (reiterating that consideration of private interests includes "the cost of obtaining attendance of willing witnesses").

Additionally, the Court must consider the private factor of enforceability of a judgment. CTI is rightly concerned about relying upon IPIC's goodwill to abide by a judgment without the ability to attach any of its property. However, a judgment by this Court against another sovereign would likewise be uncertain, as the Court could only attach properties IPIC owns in the United States. As stated above, Aabar and Tasameem presumably are subject to the attachment laws of the UAE, so enforceability of those judgments is not a concern in the private factors analysis. As such, enforceability of a judgment is a private factor weighing slightly in CTI's favor, but by no means dispositive.

Finally, "all other practical problems that make trial of a case easy, expeditious, and inexpensive" ought to be considered when weighing the private factors. Here, there are many that strongly favor dismissal. First, the oral contracts were entered into in Abu Dhabi and governed by contract law of the UAE. If the case were to proceed in this forum, the parties would undoubtedly be required to expend funds on expert witnesses in UAE law. Expert witnesses might also need to be called concerning the business etiquette of Abu Dhabi, particularly to explain the lack of written contracts in that cultural environment. Additionally, there would likely be translation costs for many documents and witnesses, whereas both members of CTI speak Arabic and are familiar with that forum. *See* Dkt. 152-10, CTI's website.

As there are no premises to view or physical evidence to transport, the Court concludes that the private interests, when weighing the presumption in favor of a plaintiff's choice of forum and the likely limited enforceability of a judgment against IPIC with the great inconvenience of transporting almost all of the witnesses across the world and the expenses necessitated by the attendant cultural differences of the UAE, are nearly in equipoise. Thus, the Court must examine the public interests to determine if dismissal is warranted.

Clearly, public factors weigh powerfully towards dismissal. "Relevant public interests include the familiarity of the court(s) with the governing law, the interest of any foreign nation in having the dispute litigated in its own courts, and the value of having local controversies litigated locally." *Liquidation Comm'n of Banco Intercontinental, S.A.*, 530

F.3d at 1356-57.   Additionally, courts may consider public interests such as maintaining comity with other nations, *Aldana*, 578 F.3d at 1299, and "the administrative burdens posed by trial," *Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1284 (11th Cir. 2001).

Here, *all* public interests dramatically urge the Court to dismiss because the dispute is quintessentially Abu Dhabian.   *Aldana*, 578 F.3d at 1298 (approving of a district court's consideration of the public factor that the action was "quintessentially Guatemalan").   The alleged oral contracts were negotiated and formed in Abu Dhabi with three Abu Dhabian companies and at least partially performed in Abu Dhabi.   More important, UAE law governs the interpretation of the oral contracts and any equitable actions of quantum meruit and unjust enrichment.   *See Wingold v. Horowitz*, 292 So. 2d 585, 586 (Fla. 1974) (holding that under Florida's choice-of-law rules recognized as early as 1856, "the nature, validity and interpretation of contracts are to be governed by . . . the country where the contracts are made or are to be performed"); *Higgins v. West Bend Mut. Ins. Co.*, 85 So. 3d 1156, 1158 (Fla. 5th DCA 2012) ("Questions bearing on the interpretation, validity, and obligation of contracts are substantive and governed by the rule of *lex loci contractus*. The rule provides that the laws of the jurisdiction where the contract was executed govern." (internal citations omitted)).   If the Court were to retain this action, it would be forced to interpret and apply foreign law against that foreign's own instrumentality.   As such, the choice of a Florida forum imposes an inappropriately heavy burden on this Court and the Middle District of Florida, a forum with no familiarity with UAE law and with little interest in adjudicating the rights of a Florida company that exclusively conducts business abroad.

Furthermore, the Court finds the public interest of protecting comity between the United States and other nations encourages dismissal of this case.  CTI submitted a declaration of Professor Cesare Romano which states that Abu Dhabi courts lack judicial independence and fail to provide minimum due process protections to litigants because Abu Dhabi's tribal family "wields absolute power over all institutions" including the judiciary. Dkt. 57-1 (declaration authored for unrelated Case No. 5:10-cv-13448-JCO-VMM). Adjudicating this dispute in an American court could easily be interpreted as a tacit acceptance of the veracity of CTI's claims that the UAE judicial system is too corrupt to justly resolve the case. *See also Aldana*, 578 F.3d at 1299 (acknowledging these implications on international comity if the district court had refused to dismiss).  Indubitably, UAE courts have a greater policy interest than the United States in adjudicating contracts entered into under its laws, in its jurisdiction, and with its own government's instrumentality.

Having determined that the balancing of private and public factors points towards dismissal, the Court need only address whether CTI can reinstate its claim in the UAE without undue inconvenience or prejudice.  CTI submitted declarations by Maroun, Kantar, and Omar Toufic Ebrahim Al Qawasimi, all of whom claimed they received threats not to return to the UAE from Mr. Al Qubaisi.  The Court does not lightly dismiss these threats. However, according to the Declaration of Ali H. Ghosheh, UAE courts generally do not hear oral arguments; rather, the court bases its decision on review of the parties' submissions and supporting evidence and with the assistance of experts who prepare written reports of their findings of fact.  Dkt. 152-21, ¶ 7.  If true, Maroun, Kantar, and Al Qawasimi need not return

to the UAE to litigate the case in that forum, so the threats do not increase any inconvenience or prejudice to reinstating the action in Abu Dhabi. No other potential sources of prejudice or inconvenience were argued by CTI.

To ameliorate the problem of not receiving enforcement power of a judgment against IPIC in the UAE, IPIC shall consent to the domestication and execution in the United States of any final judgment entered in the UAE. IPIC shall file a written stipulation agreeing to these conditions. *See Morse v. Sun Int'l Hotels Ltd.*, 2001 WL 34874967, *8 (S.D. Fla. Feb. 26, 2001) (granting a motion to dismiss for *forum non conveniens* upon condition that the Bahamian defendants stipulate to the enforcement in the United States of any final judgment).

In sum, because of the reasons stated herein, the case is dismissed against IPIC based on the doctrine of *forum non conveniens* conditional upon IPIC's written stipulation to domestication and execution in the United States of any final judgment.

It is therefore ORDERED AND ADJUDGED that:

1.    Defendants' Motion to Dismiss the Amended Complaint and Memorandum of Law (Dkt. 29) is GRANTED in part.

2.    Saadi's Motion for Leave to Intervene to Assert Charging Order Against Plaintiff Capital Trans International, LLC (Dkt. 147) is DENIED as moot.

3.    This case is dismissed with prejudice as to Defendants Aabar and Tasameem.

4.      This case will be held open for thirty (30) days for Defendant IPIC to file a

written stipulation as discussed herein.  Upon filing of the written stipulation,

the Court will dismiss with prejudice the case against Defendant IPIC.

**DONE** and **ORDERED** in Tampa, Florida on February 14, 2013.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Odd\2010\10-cv-529.mtdismiss&intervene.frm